IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

MARY E. LENARD,                           )
                                          )
          Plaintiff,                      )
                                          )
v.                                        )     Case No. 10-CV-585-PJC
                                          )
MICHAEL J. ASTRUE, Commissioner of the    )
Social Security Administration,           )
                                          )
          Defendant.                      )

## OPINION AND ORDER

Claimant, Mary E. Lenard ("Lenard"), pursuant to 42 U.S.C. § 405(g), requests judicial

review of the decision of the Commissioner of the Social Security Administration ("Commissioner")

denying her applications for disability insurance and supplemental security income benefits under

the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3),

the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this

order will be directly to the Tenth Circuit Court of Appeals. Lenard appeals the decision of the

Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ

incorrectly determined that Lenard was not disabled. For the reasons discussed below, the Court

**AFFIRMS** the Commissioner's decision.

### Claimant's Background

Lenard was 50 years old at the time of the hearing before the ALJ on August 4, 2009. (R.

23, 108). Lenard had worked as a medical records clerk and stopped in July 2007 due to back

problems and her health in general. (R. 30). In 2008, she received compensation for taking care

of her mother about three hours a day for two or three days a week until her mother died in

November.  *Id.*  Beginning in December 2008, she worked doing light housekeeping for long-term care clients.  (R. 31).  She was still doing this work at the time of the hearing in August 2009.  (R. 31-32).  She averaged about 18 hours a week, and she was not required to lift much.  (R. 32).  She testified that she worked between 2 and 6 hours a day.  (R. 34).  At her job, she could sit any time she needed to.  *Id.*  She was exhausted when she returned home.  (R. 37-38).

Lenard testified that she first injured her back in the 1980s when she slipped on outdoor steps and fell.  (R. 32-33).  She testified that she had problems with her hips because her pelvis was twisted and this condition caused a lot of pain.  (R. 33).  Her hips sometimes affected her sciatic nerves.  (R. 33, 35).  She had more numbness in her feet than other people, and she had a restricted range of motion in her hips.  (R. 35-36).

Due to her problems with her back and hips, her most comfortable position was lying down on her side with a pillow between her legs, but she needed to switch sides often.  (R. 33).  She slept about 6 hours a night, but she had to roll over and change positions often, and her sleep was not restful.  (R. 37).  When she wasn't working, she was resting the remainder of the day, with her feet up.  (R. 34).  Her pain in a rest position was about a 4, and her pain could increase to a 10.  *Id.*  Bending, lifting, stooping, or leaning could increase her pain, as could sitting or standing for too long.  *Id.*

She could stand for about 15 minutes at a time, walk for about 10-15 minutes, and sit for about 15 to 30 minutes at a time.  (R. 34-35).  Lifting more than 5 pounds put a strain on Lenard's back and caused her pain.  (R. 36).

To deal with her pain, Lenard had tried a TENS unit, weight loss, and chiropractic care.  (R. 39).  She testified that she couldn't afford medical care.  *Id.*

Lenard testified that she also suffered from pancreatitis, and acute attacks caused intense pain. (R. 39). She had these attacks at least 4 to 5 times a year. (39-40). Lenard testified that she also had fibroid cysts in different parts of her body, and they became inflamed and caused pain. (R. 39-40).

Lenard testified that she was going to Associated Centers for Therapy ("ACT") for counseling. (R. 40). She had been diagnosed with depression and anxiety. (R. 40-41). She testified that she had problems with drinking when her husband died in 2005, but after she began counseling at ACT and getting medications for depression, she stopped having problems with alcohol abuse. (R. 41). Due to her depression, she was more isolated than she had been previously, and her interests and activities were reduced. (R. 41-42).

Lenard was seen at Morton Comprehensive Health Services ("Morton") on December 5, 2005 for neck strain following a fall. (R. 268-69). She was prescribed medications. (R. 269). Diagnoses on February 1, 2006 were tonsillitis, chronic obstructive pulmonary disease ("COPD"), tobacco addiction, stress incontinence, and sinusitis. (R. 266-67). Lenard was prescribed antibiotics. (R. 267).

On June 14, 2006, Lenard was seen at Morton for several reasons, including low back pain, and she was diagnosed with chronic back pain. (R. 264-65). On June 29, 2006, she returned with complaints of anxiety and chronic back pain. (R. 262-63). On examination, Lenard was found to have mild tenderness to palpation with deformity and spasm. (R. 263). Straight leg raising was negative, and she was found to have full range of movement. *Id.* She was diagnosed with anxiety and chronic low back pain, and she was referred for psychiatric treatment and x-rays of her lumbosacroiliac spine. *Id.*

On July 12, 2006, Lenard was again seen at Morton and diagnosed with anxiety with depression and with chronic pain.  (R. 260-61).  On examination, her gait was observed as antalgic.  (R. 261).  Her anxiety medications were adjusted.  (R. 261).  She was seen for follow up on August 15, 2006.  (R. 258-59).  She was given instructions for back stretches.  (R. 259).

Lenard was seen on August 15, 2006 by Joyce Bumgardner, M.D. at ACT.  (R. 331).  On Axis I[1] Dr. Bumgardner diagnosed Lenard with major depressive disorder, recurrent, moderate, and with heart palpitations.  *Id.*  She prescribed Lexapro and Seroquel.  *Id.*

Lenard returned to Morton on September 8, 2006, and she was diagnosed with bronchitis with reactive airway disease.  (R. 256-57).

On September 12, 2006, Lenard returned to ACT and was seen by Dawn LaFromboise, M.D.  (R. 330).  Dr. LaFromboise diagnosed major depressive disorder, recurrent and mild, along with questionable anxiety, not otherwise specified, and she adjusted Lenard's medications.  *Id.*  On October 11, 2006, Dr. LaFromboise saw Lenard and changed her diagnosis to generalized anxiety disorder with mild depression, and she again adjusted Lenard's medications.  (R. 329).  On November 8, 2006, Dr. LaFromboise's diagnoses were history of alcohol dependence, generalized anxiety disorder, and major depressive disorder, euthymic.  (R. 328).  She again adjusted Lenard's medications.  *Id.*

On December 6, 2006, Lenard's chief complaint at an appointment at Morton involved sinus drainage, and she was diagnosed with allergies, chronic sinusitis, tobacco addiction, left wrist pain, and a history of depression.  (R. 254-55).  Lenard also saw Dr. LaFromboise at ACT

---

[1]The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000).

the same day.  (R. 327).  Dr. LaFromboise stated Lenard's diagnoses as history of alcohol dependence, generalized anxiety disorder, and major depressive disorder, currently mild, and she adjusted her medications.  *Id.*  Lenard was seen for a follow-up appointment on January 4, 2007, and her diagnoses were the same.  (R. 326).  Her medications were again adjusted.  *Id.*

On January 29, 2007, Lenard was seen at Morton for left wrist pain, with tingling sensation in her fingers.  (R. 252-53).  She was diagnosed with chronic left wrist pain, given a brace, and given a referral to an orthopedic specialist.  (R. 253).

On February 1, 2007, Lenard saw Dr. LaFromboise at ACT and said that she was doing really well and that her medications were helping.  (R. 325).  Dr. LaFromboise stated Lenard's diagnoses as alcohol dependence in early partial remission, generalized anxiety disorder, and major depressive disorder, mild.  *Id.*

On February 19, 2007, Lenard  returned to Morton with left forearm swelling and pain.  (R. 249-50).

Lenard presented to Hillcrest emergency room on March 23, 2007 with a chief complaint of abdominal pain.  (R. 210-11, 214-17).  The staff impressions were constipation and chronic abdominal pain, and Lenard was given pain medication and discharged.  (R. 211).  Imaging done that day showed 2 renal cysts and several cystic areas in both ovaries.  (R. 216).

On April 5, 2007, Lenard saw Dr. LaFromboise, who stated her diagnoses as alcohol dependence in early partial remission, generalized anxiety disorder, and major depressive disorder.  (R. 324).

The administrative record includes a Comprehensive Treatment Plan document for Lenard at ACT dated April 11, 2007.  (R. 306-18).  The document stated Lenard's current global

assessment of functioning ("GAF")[2] as 49 with previous GAF assessments as 46 and 47.  (R. 311-12).  Lenard's Axis I diagnoses were stated as panic anxiety and polysubstance dependence. (R. 312).

On April 26, 2007, Lenard returned to Morton and was diagnosed with epigastric pain. (R. 247-48).

The administrative record includes a report from a May 17, 2007 MRI of Lenard's lumbar spine.  (R. 199).  The reviewing physician stated that there was minimal degenerative disk disease at the L2/L3 and L4/L5 levels.  *Id.*  The L5/S1 level also suggested a small radial tear and minimal disk protrusion, but no rootlet entrapment or significant anterior thecal impingement was identified.  *Id.*

Dr. Jeffrey Emel, M.D. with the Eastern Oklahoma Orthopedic Center, wrote a report dated May 24, 2007.  (R. 200-01).  He recounted Lenard's fall in 1984 and said that her pain had returned in 2006.  (R. 200).  According to Dr. Emel's account, Lenard had been told that she had a rotated pelvis, but she did not follow through with treatment.  *Id.*  At the time of Dr. Emel's report, Lenard complained of radicular pain down both legs, with increased pain on bending, stooping, or lifting.  *Id.*  Dr. Emel agreed that Lenard's pelvis appeared to be slightly rotated and tilted.  (R. 201).  In addition, she had tenderness on examination of her hips, and she had some

---

[2]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36.   A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*.   A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

decreased sensation in her right leg.  *Id.*  Dr. Emel's recommendation was to start Lenard on a pelvic stabilization program, and he referred her to physical therapy.  *Id.*  He also recommended an epidural injection of the L5/S1 joint, and he added Lortab to her medications.  *Id.*

Lenard presented to Morton on May 30, 2007 with right side pain after a fall at home.  (R. 241-42).

Lenard presented to Hillcrest emergency room on July 26, 2007 with a chief complaint of breast pain.  (R. 212-13, 218).  The staff impression was chronic right armpit pain.  (R. 213).  Lenard then presented to Morton that same day.  (R. 238-39).  The diagnoses included fibrocystic breast, axillary lymphadenopathy, and tobacco addiction.  (R. 239).

Mammogram and ultrasound studies completed in 2007 showed multiple cysts in Lenard's breasts that were considered to be benign.  (R. 219-22).

On June 4, 2007, Lenard was seen by Dr. LaFromboise at ACT, and her diagnoses remained alcohol dependence in early partial remission, generalized anxiety disorder, and major depressive disorder.  (R. 323).  She was seen again on September 10, November 5, 2007, January 2, 2008, and February 25, 2008, and her diagnoses were not changed.  (R. 321-22).  At an April 28, 2008, Lenard asked Dr. LaFromboise to adjust her medications due to weight gain, and Dr. LaFromboise did so.  (R. 374).  She stated Lenard's diagnoses as alcohol dependence in early partial if not full remission, generalized anxiety, and major depressive disorder.  *Id.*

On June 26, 2008, an MRI of Lenard's left shoulder was done, and the reviewing physician made multiple findings.  (R. 399).

On July 15, 2008, Lenard was seen by Jeff A. Fox, M.D. at Central States Orthopedic for an initial evaluation regarding her left shoulder.  (R. 388-89).  His report stated that he discussed her treatment options, but Lenard did not want to consider conservative options and instead

wanted surgery.  (R. 389).

On August 4, 2008, Dr. LaFromboise again adjusted Lenard's medications, and she stated Lenard's diagnoses as alcohol dependence in possibly full remission, generalized anxiety, and major depressive disorder, recurrent.  (R. 373).  Her medications and diagnoses remained the same at an August 28, 2008 appointment.  (R. 372).

Lenard was seen at Morton on August 29, 2008 for back pain.  (R. 393-94).  On examination, Lenard had mild to moderate tenderness to palpation over her lumbosacral spine and her right buttock.  (R. 394).  She had full range of motion, full strength, negative straight leg raising, and no spasm.  *Id.*  The assessment was orthopedic disorder, chronic, low back and hip pain, and lumbar radiculopathy.  *Id.*  She was given a referral for consultation with an orthopedic surgeon. *Id.*

On October 8, 2008, Dr. LaFromboise at ACT adjusted Lenard's medications and stated her diagnoses as alcohol dependence in early full remission, generalized anxiety, and major depressive disorder, recurrent and mild.  (R. 371).  On November 10, 2008, her medications and diagnoses remained essentially the same.  (R. 370).  On January 5, 2009, Dr. LaFromboise stated Lenard's Axis I diagnoses as alcohol dependence in unknown remission, generalized anxiety, and major depressive disorder, recurrent and mild.  (R. 369).  She added an Axis II diagnosis of "[s]ome Cluster B traits."  *Id.*  On March 2, 2009, Dr. LaFromboise continued the same diagnoses, but adjusted Lenard's medications to help with fatigue symptoms.  (R. 368).  On March 18, 2009, Lenard saw Dr. LaFromboise because her employer wanted a letter before Lenard returned to work caring for patients.  (R. 367).  Dr. LaFromboise stated Lenard's Axis I diagnoses as alcohol dependence in unknown remission, generalized anxiety, and major depressive disorder, recurrent and euthymic, and her Axis II diagnosis as Cluster B traits.  *Id.*  On

April 28, and June 9, 2009, Dr. LaFromboise's diagnoses remained essentially the same.  (R. 365-66).

Lenard was seen at Morton on September 4, 2009 for a chief complaint of stomach swelling and pain.  (R. 402).  The assessments were diffuse abdominal pain and ovarian cyst.  *Id.*

Agency consultant Joel Justin Hopper, D.O. completed a consultative examination and report on May 8, 2008.  (R. 333-38).  On examination, Dr. Hopper noted that Lenard moved all of her extremities well, and she had a stable gait.  (R. 334).  Straight leg raising was negative.  *Id.*  On the lumbosacral spine sheet, Dr. Hopper did not note any pain with range of motion, which he found to be normal.  (R. 338).  He found heel walking to be weak in both legs, and he found dorsiflexion to be weak.  *Id.*  Dr. Hopper's assessments were lumbago, degenerative disk disease as noted on the May 2007 MRI, obesity, depression, and anxiety.  (R. 334).

A Physical Residual Functional Capacity Assessment was completed by nonexamining agency consultant Kenneth Wainner, M.D. on May 19, 2008.  (R. 353-60).  Dr. Wainner found that Lenard had the capacity to do light work.  (R. 354).  In the area for narrative explanation, Dr. Wainner noted that the May 2007 MRI showed only minimal degenerative disk disease.  *Id.*  He summarized the report of Dr. Hopper, and he summarized the reported activities of daily living of Lenard.  *Id.*  Dr. Wainner found no other limitations.  (R. 355-60).

Agency nonexamining consultant Deborah Hartley, Ph.D. completed a Psychiatric Review Technique Form on May 19, 2008, concluding that Lenard's mental health impairments were not severe.  (R. 339-52).  For Listing 12.04, Dr. Hartley noted Lenard's major depressive disorder.  (R. 342).  For Listing 12.06, she noted Lenard's diagnosis of generalized anxiety disorder.  (R. 344).  For Listing 12.09, Dr. Hartley noted the diagnosis of alcohol dependence in

early partial remission.  (R. 347).  For the "Paragraph B Criteria,"[3] Dr. Hartley found that Lenard

had no restriction of activities of daily living, mild difficulties in maintaining social functioning,

and mild difficulties in maintaining concentration, persistence, or pace, with no episodes of

decompensation.  (R. 349).  In the "Consultant's Notes" portion of the form, Dr. Hartley

summarized Lenard's activities of daily living and said that most of her limitations were due to

pain.  (R. 351).  She briefly summarized Lenard's treatment and diagnoses at ACT.  *Id.*

## Procedural History

Lenard filed applications on March 24, 2008, seeking disability insurance benefits and

supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*.  (R. 108-

15).  The applications were denied initially and on reconsideration.  (R. 61-75).  A hearing before

ALJ Deborah L. Rose was held August 4, 2009 in Tulsa, Oklahoma.  (R. 23-52).  By decision

dated November 25, 2009, the ALJ found that Lenard was not disabled.  (R. 8-18).  On July 28,

2010, the Appeals Council  denied review of the ALJ's findings.  (R. 1-3).  Thus, the decision of

the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R.

§§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

---

[3]There are broad categories known as  the "Paragraph B Criteria" of the Listing of
Impairments used to assess the severity of a mental impairment. The four categories are (1)
restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3)
difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of
decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R.
Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264,
1268-69 (10th Cir. 2008).

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[4]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

---

[4]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Lenard's date last insured was September 30, 2008.  (R. 10).  At Step One, the ALJ found that Lenard had not engaged in any substantial gainful activity since her alleged onset date of July 31, 2007.  *Id.*  At Step Two, the ALJ found that Lenard had severe impairments of degenerative disc disease of the lumbar spine, obesity, and left shoulder injury. *Id.*  The ALJ stated that Lenard's fibroid cysts, pancreatitis, and mental impairments were nonsevere.  (R. 10-12).  At Step Three, the ALJ found that Lenard's impairments did not meet any Listing.  (R. 12-13).

In her RFC determination, the ALJ found that Lenard had the RFC to perform the full range of light work.  (R. 13).  At Step Four, the ALJ found that Lenard could return to her past relevant work.  (R. 17).  Therefore, the ALJ found that Lenard was not disabled through the date of the decision.  (R. 18).

### Review

Lenard's first argument on appeal was that she did not receive procedural due process because the ALJ limited the ability of her counsel to cross-examine the vocational expert (the "VE") at the hearing.  Plaintiff's Opening Brief, Dkt. #16, p. 2.  Lenard also asserted errors at Step Four, in the ALJ's credibility assessment, and in the ALJ's treatment of the medical evidence.  Regarding the issues raised by Lenard, the undersigned finds that the ALJ's decision is

supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

**Procedural Due Process**

Lenard's first argument was that she was not provided procedural due process, arguing that her counsel was not allowed to perform meaningful cross examination of the VE.  Social security hearings are subject to procedural due process considerations. *Yount v. Barnhart* , 416 F.3d 1233, 1235 (10th Cir. 2005); *Allison v. Heckler,* 711 F.2d 145, 147 (10th Cir.1983) (citing *Richardson v. Perales,* 402 U.S. 389, 401-02, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)).

Below is the critical exchange which gave rise to Lenard's argument, and this occurred while Lenard's attorney was asking the VE questions.

> Q (by Michael Gershner, attorney for Lenard):  And then if the testimony were in fact credible today and supported by the record, would an individual with the limitations that you heard here described today - would that person be able to do -
>
> ALJ: I'm going to ask you to put that in terms of functional limitations because I'm not sure he heard what I heard.

(R. 50).  Lenard's attorney objected to this and stated that the VE should be allowed to answer based on hearing Lenard's testimony, but the ALJ overruled that objection and again asked the attorney to state his question in functional terms.  *Id.*

Under these circumstances, there was no procedural due process violation, because the ALJ did not prevent the attorney from asking the question, but instead asked him to state it in functional terms so that the question, and therefore the VE's testimony, would be more clear. Lenard's attorney could have recited the functional limitations that he believed Lenard's testimony supported, and could have then asked the VE about the ability of a person with those limitations to perform work.  Because Lenard's attorney was not prevented from exploring this line of questioning, but was merely prevented from asking the question in the form he preferred,

the ALJ's interruption and requirement of restating the question was not a violation of procedural due process.

**Step Four Issues**

Regarding asserted errors at Step Four, Lenard's first argument was that the ALJ should have included her nonsevere mental impairments in her RFC determination. Plaintiff's Opening Brief, Dkt. #16, p. 3. In this case, however, the ALJ made specific findings that Lenard's mental impairments were nonsevere and would not "result in any significant work-related limitations." (R. 10). These findings by the ALJ made it clear that she found no limitations related to Lenard's nonsevere mental impairments that needed to be included in her RFC determination. *See, e.g., Qualls v. Astrue*, 428 Fed. Appx. 841, 850-51 (10th Cir. 2011) (unpublished) (rejecting claimant's argument that the ALJ had omitted limitations in the RFC determination that resulted from nonsevere mental impairments); *Dray v. Astrue*, 353 Fed. Appx. 147, 150-51 (10th Cir. 2009) (unpublished) (evidence of mild mental impairments did not contradict ALJ's RFC determination omitting any limitations related to mental impairments).

Lenard also claimed error in the ALJ's failure to inquire regarding the mental demands of her past relevant work, citing *Dorman v. Astrue*, 368 Fed. Appx. 864, 865-66 (10th Cir. 2010) (unpublished). The facts of *Dorman*, however, appear to be distinguishable from Lenard's situation, in that the ALJ in *Dorman* apparently included mental impairments in his Step Two finding as severe impairments while at the same time describing them as "mild." *Id.* at 865. The Tenth Circuit said that the ALJ's failure to inquire regarding the mental demands of the claimant's past relevant work was erroneous. *Id.* at 866.

Here, however, the ALJ made affirmative findings that Lenard's mental impairments were nonsevere and would not interfere with her ability to work. (R. 10). Therefore, the ALJ did

not include any mental functional limitations in her RFC determination.  (R. 13).  Under these

circumstances, in which the ALJ affirmatively found no severe mental impairment and no

corresponding mental functional limitations, the ALJ was not required to make an inquiry of the

VE regarding the mental demands of the claimant's past relevant work.  *See Wall v. Astrue*, 561

F.3d 1048, 1068-69 (10th Cir. 2009) (ALJ's analysis that the claimant could perform past

relevant work was adequate and remand would needlessly prolong proceedings); *Fischer-Ross v.*

*Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005) (ALJ's detailed findings at Step Four and Five

made remand for Step Three error unnecessary); *Qualls*, 428 Fed. Appx. at 850-51 (no error at

Step Four when the ALJ included no mental limitations in RFC determination).

The undersigned finds no error at Step Four of the ALJ's decision.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.

In her decision, the ALJ found Lenard to be less than fully credible.[5]  (R. 14).  She then

recited the seven factors of SSR 96-7p and gave short factual summaries for each factor.  (R. 15).

The ALJ then addressed the objective medical evidence in some detail.  (R. 15-17).  She ended

with a brief summary of how the evidence supported her RFC determination, noting that Lenard

continued to work 18 hours per week, performed activities of daily living, and provided care for

her mother, her boyfriend, and her grandchildren after her asserted date of onset of disability.  (R.

17).  Thus, the ALJ's analysis was detailed, and she gave specific reasons that were closely

linked to substantial evidence.

Lenard made three full pages of arguments attacking the ALJ's credibility assessment,

and many of these consisted of one or two sentences.  Plaintiff's Opening Brief, Dkt. #16, pp. 4-

7.  The Court is aware that counsel does not want to waive any issues by failing to raise them, but

such undeveloped arguments themselves may constitute a waiver.  *Wall*, 561 F.3d at 1066

(undeveloped or "perfunctory" arguments deprive the district court of the opportunity to analyze

and rule on the issue).

Lenard's first topic of attack on the ALJ's credibility assessment was related to the ALJ's

references to her activities of daily living.  Plaintiff's Opening Brief, Dkt. #16, pp. 4-5.  Lenard's

arguments are sometimes difficult to follow, such as when she said that the ALJ "ignored there

was no correlation of the ADLs with actual ability to do labor, and no inconsistencies

demonstrated."  *Id.* at 4.  This language seems inapplicable because the ALJ's description of

Lenard's activities of daily living stated that she worked "18 hours a week as a health care

---

[5]Lenard faulted this language as meaningless boilerplate, but this sentence was merely an
introduction to the ALJ's analysis and was not harmful.  *See Kruse v. Astrue*, 2011 WL 3648131
at *6 (10th Cir.) (unpublished) ("boilerplate language is insufficient to support a credibility
determination only in the absence of a more thorough analysis").

provider helping patients with personal care, [doing] light dusting, [making] the bed, and [doing] laundry." Thus, in this case, Lenard's activities of daily living exactly correlated with the "actual ability to do labor" in contradiction to the language Lenard included in her brief.  These activities are completely consistent with light work, although Lenard faulted the ALJ for not explicitly stating this.  The ALJ was not required to explicitly "acknowledge that an individual must be capable of work on a full time basis," and she did not, as Lenard stated, imply that Lenard "performed her ADLs for eight hours daily."  These arguments are not persuasive. *Kruse*, 2011 WL 3648131 at *5.

Lenard next attacked the ALJ's credibility assessment for various reasons connected to Lenard's pain, first stating that the ALJ "ignored" or did not note different aspects of her pain. Plaintiff's Opening Brief, Dkt. #16, p. 5.  The undersigned finds, in contrast, that the ALJ's discussion of the evidence related to Lenard's pain was thorough, and she did not ignore this evidence.  (R. 13-17).  The ALJ first summarized Lenard's own testimony regarding her pain, including Lenard's testimony regarding the duration, frequency, and intensity of her pain, which Lenard's brief stated that the ALJ "failed to note."  (R. 14).  In her discussion of the seven factors relating to credibility set out in SSR 96-7p, the ALJ again specifically discussed these aspects of Lenard's pain.  (R. 15).[6]  Regarding Lenard's problems with her left shoulder, the ALJ summarized the objective medical evidence, and she discounted Lenard's credibility because she had not had shoulder surgery after telling the physician that she wanted to proceed with surgery,

---

[6]Lenard's attorneys faulted the ALJ for boilerplate "cut and pasted from one decision to another."  Plaintiff's Opening Brief, Dkt. #16, pp. 5-6.  To this reviewer, however, it appears that Lenard's attorneys were guilty of cutting and pasting language regarding multiple credibility arguments into the brief in this case, regardless of whether those arguments were applicable. This is not effective advocacy, and the Court urges Lenard's attorneys to be more selective in their arguments in future filings.

and because Lenard did not testify regarding any problems with reaching.  (R. 17).  Lenard

complained that the ALJ did not mention her medications and the various adjustments or side

effects to them  in enough detail, but the undersigned finds that complaint to be unsupported.

The ALJ adequately discussed Lenard's medications.  (R. 15-17).

Lenard argued that the ALJ was required to specifically discuss an observation that an

agency clerk made that Lenard was limping, stating that this was significant probative evidence

that she rejected.  Plaintiff's Opening Brief, Dkt. #16, p. 6.  The undersigned disagrees with this

characterization of the observation of the clerk, and the ALJ otherwise adequately discussed the

evidence regarding Lenard's ability to walk.  She summarized Lenard's testimony on this point.

(R. 14).  She noted that a physician found that Lenard's left leg was 1 cm shorter than her right

leg.  (R. 15).  She noted treatment for right leg radiculopathy.  (R. 16).  She summarized the

report of the consultative examiner that Lenard moved about the room easily and her gait was

stable, that straight leg raising was negative, and that she had problems with toe and heel

walking.  (R. 17).  The ALJ's discussion of the evidence was balanced, and her omission of the

observation of the clerk does not require remand.  *See Holcomb v. Astrue*, 389 Fed. Appx. 757,

760 (10th Cir. 2010) (unpublished) (ALJ was not required to discuss lower GAF scores that were

"bits of information not essential to [the claimant's] RFC determination, inadequate to establish

disability, and contradicted by an opinion from an acceptable medical source"); *Korum v. Astrue*,

352 Fed. Appx. 250, 253-54 (10th Cir. 2009) (unpublished) (ALJ's opinion was thorough, and

evidence not mentioned by the ALJ was not of such quality as to require discussion).

The next paragraph of Lenard's brief included many different threads of arguments

attacking the ALJ's credibility determination.  Plaintiff's Opening Brief, Dkt. #16, p. 6.  She first

complained that the ALJ faulted her for "not having the recommended shoulder surgery."  *Id.*

The undersigned would not describe the ALJ's statement as assigning fault, but rather as an explanation of why she found that Lenard could perform the entire range of light work, without giving any limitations based on her shoulder injury.  (R. 17).  The failure to be diligent in seeking treatment for an impairment that the claimant asserts is disabling is a legitimate factor for the ALJ to cite in making a credibility assessment.  *Qualls v. Apfel*, 206 F.3d 1368, 1372-73 (10th Cir. 2000) (failure to seek treatment was legitimate reason for ALJ's credibility assessment); *Harris v. Astrue*, 285 Fed. Appx. 527, 531 (10th Cir. 2008) (unpublished) (claimant's failure to return to neurosurgeon for treatment when her pain became more severe was one legitimate reason supporting the ALJ's credibility assessment).

Lenard's statement that surgery is not required for one to be disabled is correct, but does not apply to the ALJ's reasoning here, which was to discount the disabling nature of Lenard's shoulder injury, given her failure to follow through with surgery.  Lenard then said that inability to afford treatment is a legitimate excuse for not seeking medical care, but Lenard only mentioned in passing not being able to afford health care at the hearing.  (R. 49).  Moreover, the medical records showed that she saw the orthopedic specialist and did not want to consider conservative treatment, but wanted to pursue surgery.  (R. 389).  She apparently never saw the orthopedic specialist again, but she did return to Morton for her back pain in August 2008 and for stomach swelling and pain in September 2009.  (R. 393-94, 402).  Neither of these records mentioned the shoulder injury or any request by Lenard for treatment of that injury.  Thus, Lenard's argument relating to monetary resources does not seem to undercut the ALJ's reasoning that Lenard did not follow up on treatment options for her shoulder injury.

Lenard then stated that the ALJ "did not consider [Lenard's] relentless attempts to find relief."  As the Court has noted previously, this statement is patently incorrect, because the ALJ

did, in fact, thoroughly summarize Lenard's testimony and the medical evidence.  (R. 13-17).

Lenard complained that the ALJ "ignored" the fact that Lenard had to stand during the hearing,

but this is similar to the assertion that the ALJ "ignored" the fact that the clerk stated that Lenard

limped.  It was not evidence of sufficient quality to mandate that the ALJ recite it in her decision.

Lenard then complained that the ALJ "is supposed to consider the Claimant's demeanor."

Plaintiff's Opening Brief, Dkt. #16, p. 6.  There is no reason to suspect that the ALJ here did not

consider Lenard's demeanor in making her credibility assessment.

Lenard's next subject was her part-time work, stating that the ALJ appeared to fault her

for that work.  *Id.* at 7.  Again, the undersigned would not characterize the ALJ's reasoning as

finding fault, but rather as stating that Lenard's ability to do the kind of work that she did for 18

hours a week supported the RFC determination that she could perform the entire range of light

work.  (R. 17).  Lenard then stated that the ALJ "ignored" her good work record, which should

have been weighed as a favorable credibility factor.  Plaintiff's Opening Brief, Dkt. #16, p. 7.

The ALJ recited much of Lenard's work history, and there is no indication that she did not

consider this in making her credibility assessment.  (R. 13-14).

In her last paragraph relating to the issue of credibility, Lenard broadly stated that the

ALJ's credibility assessment was not supported by substantial evidence and that it was nothing

more than a conclusion in the guise of findings.  Plaintiff's Opening Brief, Dkt. #16, p. 7.  The

Court rejects these broad statements and finds that the ALJ's credibility assessment was based on

specific reasons that were closely linked to substantial evidence.  Lenard's arguments to the

contrary are simply a request that this Court reweigh the evidence, and the Court must decline

this invitation.  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).  The ALJ's

credibility assessment is affirmed.

**Medical Evidence**

The final topic of Lenard's appeal was the medical evidence, including the opinion evidence.  She first stated, correctly, that the opinion evidence of the nonexamining agency consultants are due lesser weight than opinions of examining consultants or of treating physicians.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  However, the opinion evidence of even nonexamining agency consultants is substantial evidence that can be relied upon by the ALJ.  *See, e.g., Cowan v. Astrue*, 552 F.3d 1182, 1189-90 (10th Cir. 2008) (opinion evidence of nonexamining consultants can constitute substantial evidence); *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (ALJ entitled to consider nonexamining physician's opinion);  *Weaver v. Astrue*, 353 Fed. Appx. 151, 154-55 (10th Cir. 2009) (unpublished) (nonexamining opinion was substantial evidence supporting RFC determination).

Lenard stated that the ALJ was "incorrect" in stating that nothing contradicted the opinion evidence of the nonexamining consultants, Dr. Wainner and Dr. Hartley.  Plaintiff's Opening Brief, Dkt. #16, p. 7.  However, Lenard did not give examples of what she contended contradicted the nonexamining consultant reports.  She then stated that the opinion evidence was not weighed as required.  *Id.*  Again, the undersigned finds that the ALJ's decision directly contradicts Lenard's statement, because the ALJ explicitly stated: "As for the opinion evidence, great weight is given to the State agency medical consultants' opinions regarding both the mental and physical impairments."  (R. 17).  The ALJ completed this thought by describing some of the aspects of those reports that the ALJ believed were supported by the medical evidence.  *Id.*

Lenard may have intended her next paragraph to provide examples of how the evidence contradicted the medical opinion that Lenard did not have a severe mental impairment.  Plaintiff's Opening Brief, Dkt. #16, pp. 7-8.  She stated that the consultant and the ALJ did not

mention that Lenard was anxious and disheveled at some of her appointments at ACT, apparently

viewing this as evidence contradicting the opinion evidence.  *Id.*  As discussed above, the ALJ is

not required to discuss every individual fact.  *Grede v. Astrue*, 2011 WL 4448851 *3 (10th Cir.)

(unpublished); *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004).  Dr. Hartley's

Psychiatric Review Technique form did explicitly mention a disheveled appearance and agitation

from the ACT treatment records.  (R. 351).  The ALJ's decision and Dr. Hartley's report did an

acceptable job of discussing the important evidence relating to Lenard's claim of disabling

mental impairment.  (R. 13-14, 16-17, 351).  In any event, a disheveled appearance and the other

specifics listed by Lenard are not necessarily inconsistent with a finding that Lenard's mental

impairments were mild.

Lenard made a more detailed argument in asserting that the ALJ was required to note her

GAF scores of 46 and 49.  Plaintiff's Opening Brief, Dkt. #16, p. 8.  GAF scores can be

important medical opinion evidence that should be considered and discussed by the ALJ.  *Givens

v. Astrue*, 251 Fed. Appx. 561, 567 (10th Cir. 2007) (unpublished) (*citing Watkins v. Barnhart*,

350 F.3d 1297, 1300 (10th Cir. 2003)).  *See also Langley v. Barnhart,* 373 F.3d 1116, 1122-23

(10th Cir. 2004) (GAF scores of 53 and 50 indicated moderate and serious symptoms, and

needed to be included in analysis of opinion evidence).  In Lenard's case the GAF scores were

included in the one comprehensive treatment plan that is included in the administrative record,

dated April 11, 2007.  (R. 306-18).  There are no other documents that gave a GAF score, and

therefore Lenard's statement that her GAF score was never recorded to be over 49 does not carry

enormous significance.  Moreover, Lenard had only been attending ACT beginning in August

2006, and therefore this one set of GAF scores was based on about 8 months of visits.  (R. 324-

31).  During this time, Lenard's depression was on several occasions noted to be "mild."  (R.

325-27, 330).  Thus, because the GAF scores were only made, apparently, on one occasion, there was no other opinion evidence of the treating psychiatrists that indicated that they considered Lenard's mental condition to impair her ability to work, and the ALJ and Dr. Hartley gave sufficiently detailed discussions of the evidence of Lenard's treatment history at ACT, the omission of a specific discussion of GAF scores of 46-49 does not require reversal.  *Accord, Grede*, 2011 WL 4448851 at *3 (express consideration of GAF score of 50 was not required); *Butler v. Astrue*, 412 Fed. Appx. 144, 146-47 (10th Cir. 2011) (unpublished) (ALJ's failure to specifically discuss low GAF scores was not reversible error when ALJ adequately discussed the treating psychological evidence and the scores were not uncontroverted).

Lenard next stated that the ALJ did not explain "why he (sic) chose one opinion over another."  Plaintiff's Opening Brief, Dkt. #16, p. 8.  In her next sentence, she said that the ALJ did not properly consider "two reports by orthopedic doctors," referring to the reports of Dr. Emel in May 2007 and Dr. Fox in July 2008.  (R. 200-01, 388-89).  Lenard's assertion that the ALJ "reviewed [Dr. Hopper's consultative] report to the exclusion of" the reports of Dr. Emel and Dr. Fox is patently incorrect.  Plaintiff's Opening Brief, Dkt. #16, p. 8.  The ALJ devoted most of a long paragraph to the report of Dr. Emel, listing most if not all of the findings Dr. Emel made upon examination that Lenard listed in her brief.  (R. 15-16).  The ALJ wrote a shorter paragraph regarding Dr. Fox's report, which was limited to the issue of Lenard's shoulder injury.  (R. 17).  Her summary of Dr. Hopper's report is about the same length as her summary of Dr. Emel's report, and therefore Lenard's claim that the ALJ gave improper focus to the report of Dr. Hopper to the exclusion of the reports of Dr. Emel and Dr. Fox is unfounded.

The more important point is that the ALJ did not "choose" the report of Dr. Hopper over the reports of Dr. Emel and Dr. Fox.  None of those reports included opinion evidence.  The

Tenth Circuit in *Cowan* explained that a "true medical opinion" was one that contained a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform." *Cowan,* 552 F.3d at 1188-89. Thus, the court found that a statement by a treating physician that the claimant had a stroke "and I feel he may never return to work" was not a true medical opinion. *Id. See also Martinez v. Astrue,* 316 Fed. Appx. 819, 822-23 (10th Cir. 2009) (unpublished) (ALJ did not need to provide specific legitimate reasons for rejecting portion of treating physician's letter that contained only generalized statements); *Mann v. Astrue*, 284 Fed. Appx. 567, 570 (10th Cir. 2008) (unpublished) (treating physician recommendation that the claimant see an orthopedic specialist was not a treating physician opinion because it did not address functional limitations). Because the reports of Drs. Hopper, Emel, and Fox were not opinion evidence, the ALJ did not weigh those reports and did not choose one over the others. Instead, the ALJ relied on the only opinion evidence regarding Lenard's physical limitations, which was Dr. Wainner's report, and the ALJ stated she gave it "great weight." (R. 17). As discussed above, the opinion evidence of Dr. Wainner was substantial evidence that the ALJ was entitled to rely upon. *Cowan*, 552 F.3d at 1189-90; *Flaherty*, 515 F.3d at 1071; *Weaver,* 353 Fed. Appx. at 154-55.

Finally, Lenard reasserted her argument that the ALJ should have considered her shoulder injury, stating that the ALJ cannot consider only the evidence supporting her decision and exclude evidence favoring the claimant. Plaintiff's Opening Brief, Dkt. #16, p. 9. Again, the ALJ did not exclude the evidence relating to Lenard's shoulder injury that was arguably favorable to her disability claim. Instead, the ALJ explicitly discussed Dr. Fox's report, including that on examination Lenard had positive impingement and that the MRI showed a

partial thickness rotator cuff tear.  (R. 17).  There was no other medical evidence[7] relating to Lenard's claim that her shoulder injury affected her ability to reach.  Thus, the ALJ adequately considered the medical evidence relating to Lenard's shoulder injury.

The ALJ did not commit any reversible error in her consideration of the medical evidence.

## Conclusion

All of the arguments made by Lenard essentially are that Lenard would like for this Court to give more weight to the evidence that is in her favor and less weight to the evidence that disfavors her claim of disability.  This "invitation to this court to engage in an impermissible reweighing of the evidence and to substitute our judgment for that of the Commissioner," must be declined.  *Hackett*, 395 F.3d at 1173; *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence); *Freeman v. Astrue*, 2011 WL 4866467 at *4 (10th Cir.) (unpublished).

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence.  We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citations, quotations, and brackets omitted).

---

[7]All of the citations in Plaintiff's Opening Brief are to subjective complaints Lenard made in reports to the Social Security Administration.  Plaintiff's Opening Brief, Dkt. #16, p. 9.  The ALJ made a supported finding that Lenard was less than fully credible, and therefore the ALJ was not required to accept Lenard's subjective complaints regarding her difficulties in reaching and in using her arm.

The decision of the Commissioner is supported by substantial evidence and the correct

legal standards were applied.   The decision is **AFFIRMED**.

Dated this 23rd day of November, 2011.

Paul J. Cleary
United States Magistrate Judge